May it please the Court, Counsel. Jennifer Kieswetter on behalf of Layla Moore. If the Court does not mind, Counsel and I had a procedural question, since this is a cross-appeal, whether we would both get rebuttal opportunities on our issues. Are we both allowed rebuttal opportunities on our issues? Counsel and I had that question because it is a cross-appeal. So since he will not be addressing his issue until second, would he then be allowed to speak again after I speak again? No. We set those rules. Okay. He will get one time to talk. Okay. I just wanted to confirm that before we begin, Your Honor. Please proceed. Thank you. This is a case and with the cross-appeal, the issue that I appealed on is the issue of temporary total disability. I will try to limit speaking at all on the medical issue until Counsel talks about that. But for the most part, this again is a manifest way to the evidence case. And the majority of the Commission's decision here, which overturned the arbitrator, is discussing this March 6, 2009 video in which Petitioner Layla Moore is bowling. Now, Miss Moore has left hand injury, complex regional pain syndrome. And in the video, and I would point out here, although I know you're looking at the Commission decision, I think it is important to note that the arbitrator did have different findings here with regards to the video. But the video itself is less than an hour long. And in the video, there are a few occasions where you can see use of the left hand. Now, I think there are a couple of occasions where when she's going to bowl, she will use her left hand to cradle the right hand of the ball. And there are a couple of occasions where she is holding the ball with both hands. What the Commission determined was, well, after seeing this video, we don't agree that she's entitled to end more temporary total disability because we really just don't think she's very credible. And you're appealing the denial of TGD benefits from March 6, 2009 to March 25, 2009. That is correct. Now, this is a 19. That is true, but it could have implications on continued treatment, which is not an issue before you remand, because this is a 19B hearing. So while it is only three weeks, she's not at MMI yet. There's no finding that she's at MMI yet necessarily. So on remand, further TGD could be awarded. So this really is potentially opening up the door for a greater issue on TGD. I think you just framed the issue correctly. You have this video that she's bowling. The they wrong in doing that? They're using that to terminate the TGD. Why? Well, and this is why they're wrong in doing that. Because they have to have support for their finding of their concern about petitioner's credibility. And they say because of this video, we don't believe petitioner's representations about what she can do. Well, they have to have support for that. What is petitioner representing that she can do? Petitioner testified, I'm good for about three to four hours. I can do housework for three to four hours. I can use my hands for three to four hours. I can do activities where I predominantly use my right hand for three to four hours. Then I start to have problems. So the question I would have is, how does this video change or question petitioner's credibility as to that statement? It's consistent with that statement. The video is less than an hour long. Is that a normal daily activity, bowling? Is bowling a normal activity that you do during the day? I mean, she could testify that in a normal activity, she doesn't have this problem. But bowling is fairly strenuous. You've got to throw a ball that weighs probably minimum 10, 11, 12 pounds. Could be, Your Honor, if she were left-hand dominant. But she's not throwing the ball with her left hand. In the video, what she's doing with her left hand is incredibly minimal. Which is why, although I know you don't give deference to the arbitrator's decision, he points out very well what she does. It is minimal. I mean, she is not bowling with her left hand. If she were, I probably wouldn't be here. But the point is, the activity that she's doing in this video is consistent with her testimony. I'm good about three or four hours. We don't know where she would have been after doing this for three to four hours. But it wasn't much. This is less than an hour. And it's very minimal. Not only that, the Commission seems to accept that. Because they say, well, and it's on page two of their decision, while it's true that the activities are not akin to continuous work tasks, they raise some concerns about her credibility. And again, I know they're the judge of credibility. But they have to have support for this raising concerns about her credibility. What do you mean support? They've got the video. They make observations about what they see in the video. How much more specific do they need to get, in your opinion? Because the question becomes, how does the video raise a question as to her credibility? What about the video is inconsistent with what she and the doctors are saying she can do? Well, didn't she testify at some point, you know, that she obviously ended up with a lot of pain as a result of this accident? Didn't she ever testify to that? After three to four hours, she testified she had difficulty with activity. And that's where the TTD issue really came up, because they had her on this continuous bagging job, which she did for a few hours, a couple of times, once in July and once in February, and ended up in occupational health where there were objective findings of swelling. And that is where the TTD issue came up, because after that, so the point is, she does have pain complaints, but her pain complaints are, I'm good for about three to four hours. This video doesn't show activity. Well, maybe they looked at the video. At one point it says here, quote, Klayman tosses the bowling ball into the air and back down onto her left hand. Have you bowled recently? Yes, I have bowled. Who is throwing a bowling ball up and catching it in one hand, in a good hand, let alone a bad hand? The description compared to how it's actually on the video, though, it is not, I mean, and that is what I would point out, and obviously I know you have the video, but if you see what she is doing with her left hand on this video, it is not anything where you would look at that and think this woman could do a continuous or repetitive task for more than four hours. We're not even saying she couldn't do the bagging job for three or four hours. We're saying after that it's a problem. So the question becomes, this isn't somebody who is holding themselves out, not able to do anything. She testified at hearing, I'm willing to work. She worked after the accident for six months doing paperwork, but they didn't have that to offer her anymore. And after she was taken off from the bagging job with swelling, she sorted screws at a table and she didn't complain. She would have continued to do it. I see your argument. You go round and round all afternoon. You're basically saying there is nothing depicted in this video of bowling that was inconsistent with her testimony. I mean, that's the essence of what you're saying, right? Yes, yeah. The essence of what I'm saying is I know they can judge credibility, but they have to have support for saying petitioner is not credible. And the video, in your opinion, doesn't provide that support. Very simple, right? That's your opinion. Correct. I think the video is consistent with what she's testifying to, which is I'm good about three or four hours. It doesn't suggest that she's not good about three or four hours. So I don't think there's anything in the video that would substantiate cutting off TTD. I mean, the video is consistent with all the other evidence. She's good for about three to four hours. We don't know anything from the video that would suggest that she could do eight hours of repetitive bagging. She might be able to do eight hours of something else, but she's willing to do eight hours of something else. So I think what's shown in the video, and that is why I point out the arbitrator's decision as well, even though I know you don't lean on that, is how can the commission, how is this a reasonable inference for them to draw that TTD should be terminated based upon what's really going on in that video by saying, well, we don't believe her pain complaints, when her pain complaints are, after about three to four hours, I have problems using my left hand. Maybe they felt that if somebody could throw the bowling ball up in here and catch it, they should be able to go longer than four hours. Well, as you see the actual motion in the video, it is not as dramatic as that statement makes it sound. And that's what I'm saying, is the use of her left hand as shown in that video is just as the arbitrator described, which is minimal. It's minimal. It's nothing that would suggest that for more than four hours, this woman could do this continuous bagging job. It may suggest that she can do some activity, which no one's disputing. It may suggest she can sit at a table and sort screws. It may suggest she can do paperwork. The only other thing I'd like to point out is, even if you believe that, let's assume that we believe what the commission is saying, and this automatically means this woman could do this job. They never offered it to her again. They didn't come back after this video and say she could do the bagging job. We don't even know that it's available. They did not offer it to her again. She continued to have medical treatment. After February 18, 2009, they didn't offer her any work. The last work she did, they were sorting screws. They didn't offer it to her. They didn't come back and say, can you try this again now, even though you've been treating for another month? She had nerve blocks in between there. And they didn't come back and say, you know, after we see this, we think she should try this bagging job again, because maybe she'll be able to do it. What did the commission mean when they said, this award in no instance shall be a bar to a further hearing and determination of a further amount of TTD for compensation for permanent disability? What do they mean by that? My understanding is what they mean by that is anything after March, I believe, 25, 2009, I would raise then, which comes back to my argument of, I'm really here over more than three weeks of TTD, because I don't want this decision to be final. When you go back, as a result of this case, you go back to the arbitrator, can they set further TTD? Yeah, they sure could, but I think this decision on TTD could impact some of that, certainly, depending on whether or not this was found to be an appropriate finding by the commission. In other words, I may have a problem with being upheld if they say, which is akin to my argument again, is when did they ever re-offer the job to her? I mean, we can't assume this job was always there, because from July of 2008 through February of 2009, they never re-offered any work to her. So to assume this is an open-ended job, why wasn't it open-ended between July and February? So even if you believe, which I don't think there's support for, again, it's not like they saw the video and there was a re-offer of the job. So I think that's a necessary step, but I don't, I think that is a necessary step here. And there's no evidence that she's at MMI, so it really comes down to not even necessarily whether she can work in some capacity, but whether she can do this particular job. She's willing to work in some capacity, and they've never offered her anything else. Mr. Counsel, you have the opportunity on rebuttal. Thank you. Counsel, please. Members of the Court, Ms. Kingswater, my name is Bob Alwick. I represent the company HCC Inc. Who imposed these restrictions? Who said Leah Moore can't work her regular job? Dr. Clack testified by way of an evidence deposition, and he probably did the most outrageous thing I've ever seen a witness do. If he didn't like the question, he just didn't answer. As I point out in my brief on page 12, I asked Dr. Clack, she indicated that sitting made her better, does that make sense? And he goes, well, I'm not going to go down that line of questioning, Counsel. I'm not going to answer. I asked him, did she indicate sitting makes her better? Does that make sense? He goes, I don't prefer to follow that line of questioning. So you're not going to answer? No, I'm not. I asked him, so she said walking makes her better. Does that make sense? He goes, well, with all due respect, I don't prefer that line of questioning. Anyone who's a lawyer in this state should be outraged by an expert witness coming into court in an evidence deposition, putting up his arms and going, you know what? I think that puts my client and my patient in a bad light. I'm just not going to answer. These were not legal objections. There was not one objection from this Kingswater. Not one. I moved to strike the deposition. I said, he doesn't get to make up these rules. The arbitrator ignored it and found this doctor to be credible. I asked the commission to strike this deposition. They ignored it. But what they did was they also ignored his opinion. And his opinion is the only opinion that says she needs future medical treatment, and his opinion is the only one that has medical restrictions. Now, why does this videotape affect her credibility? Because during that deposition, this is what else Dr. Clark said. Now, you're arguing the same three weeks of TTD, right? Yes, Your Honor. But I'm also arguing because my cross appeal has to do with medical treatment that the commission ordered. The commission ordered us, the commission denied medical treatment with Dr. Clark. Dr. Clark was recommending a pain management treatment, which can be pricey. The commission denied that. And they denied the TTD. It was a circuit called LaSalle County that found their decision about future medical treatment to be against the manifest way of the evidence. That's my cross appeal. That was kind of the genesis of Ms. Kingswater's procedural question. Because I have a totally different issue here. But my issue is going to dictate what happens after we leave here today, and this Court renders a decision. So you want us to reverse that portion of the circuit court judgment, which reversed the commission's decision to vacate the prospective medical treatment? Yes, Your Honor. I want this Court to find that the commission's decision was supported by the evidence and not against the manifest way of the evidence. I asked Dr. Clark, and he testified a month before we tried this case, a month before I knew this person bowled. Because the bowling video was only four days before trial. We didn't have any time to do anything. We barely got the investigators there. I asked Dr. Clark, so could she go shopping and lift small items with her left hand? He said no. I said, could she lift a handkerchief? He said yes. I said, how about two handkerchiefs? He said maybe. At the time, I didn't know how much that was going to come back and haunt him, but it does with this video. Because as the Court correctly points out, here is a person who is so disabled, in such pain, such incredible agony, that she can't go back to the job we offered, yet she can go out and bowl. I don't want to oversell the tape. She's right-handed, she bowls with the right hand, but when you look at the tape, she lifts the ball with her left hand, she takes it out of the gutter with her left hand, she goes like this with other people. If I am to look at the videotape and tell me, you can tell from the videotape what's wrong with her. Well, she clearly appears to be capable of doing more than holding a handkerchief. So I don't think that anybody could look us in the eye and say that. However, the opposing counsel says she testified she's good for three or four hours. She never testified she couldn't lift a handkerchief, did she? That's true. That's what she testified to. So what do you make of this? She can do it for three or four hours, so what? She's bowling. She never said she couldn't do anything. Now we're into a he said, she said. Because on page 773, Dr. Pomerantz said she'd go back to work. On page 77, Dr. Pomerantz said she'd go back to work again. On page 781, Dr. Pomerantz said she'd go back to work again. On page 79, my expert, Dr. Ingerman, who, by the way, answered all questions, both on direct and cross-examination, testified that she could go back to work lifting 15 pounds. The job we offered to her was there were ten screws on a table and a two-by-four-inch baggie. She had to move those screws from the table onto and into a bag and seal it. That was the job, and not one doctor other than Dr. Plott says she can't do that. Not one. And her testimony, in essence, says she could only do that three or four hours? Is that what you make of this three or four-hour testimony? Well, I don't believe her testimony. Well, let's assume for the sake of the argument, you put it in the best light, she couldn't do that for more than three or four hours, correct? That's what she's saying. Okay. And the commission didn't believe it. And that's their job, because they saw her. The other thing about this case is they called Josh Holland, their star witness. Josh Holland came in and said, you can't do this job with one hand. So I said, Mr. Holland, have you ever done the job? He goes, yes. I go, when did you do it? When I broke my hand. You broke your hand? Yeah. He did this job with one hand in a cast. Now, they can sit here and focus in on one thing, but I'll tell you, Dr. Pomerantz released her, Dr. Ingram released her, Josh Holland did the job with one hand, and this is one easy job, and we have videotaper for Bowling, and they say anybody who denies TTD based with all of that, that decision is against the manifest weight of the evidence. Well, that just isn't so. Now, the only medical treatment that the arbitrator had awarded, which the commission vacated, was Dr. Klock's treatment. Dr. Klock wants to enroll her in a pain management program and start doing injections. And the commission denied that. That's the treatment they denied. And I think the reason they denied it is because Dr. Klock was so smug that he wasn't going to be cross-examined by some lawyer from Chicago. And I don't know what remedy this court has in this case, but I think what the commission did is we are not going to believe a doctor who on cross-examination makes up his own rules, it's his bat and his ball, and if he prefers not to answer questions, he's just not going to. The commission got absolutely right. They denied the TTD after March 6th of 2009 because there was this videotape only four days earlier, and they denied future medical treatment because the only doctor on the planet was Dr. Klock, and Dr. Klock wasn't a cooperative witness. He snubbed his nose at the commission, and I don't think they're going to buy it. So we're asking the court to affirm the commission's decision and reverse the circuit court's finding that petitioners entitled to future medical treatment by Dr. Klock. The arbitrator specifically said Dr. Klock. He didn't say general treatment. He said specifically Dr. Klock. And this commission reversed it. Counsel, please rebuttal. With regards to the TTD issue, regarding the testimony of Josh Holland, Josh Holland had his hand in the cast. He could still use his fingers to do the job. He could still use that hand to do the job. He did not perform it one-handed, and he testified to that. You cannot perform the job one-handed. So a suggestion that that means that Ms. Moore could also do it more than four hours, I don't know what that suggestion is about. But with regards to the TTD, again, I accept that the commission is the finder here of credibility, but my argument is there's no support for their finding of credibility here. None of the evidence here is contrary to petitioner's statement that she's good for about three to four hours. With regards to the medical issue and the complex regional pain syndrome, the suggestion that the commission rejected Dr. Klock or that his refusal to answer questions had anything to do with this is nowhere in the decision. In fact, the decision of the commission is to the contrary. The commission awards all of her treatment through the date of hearing. The only thing they do is vacate the award of prospective medical that the arbitrator awarded. So the commission had no problem with her prior treatment with Dr. Klock, and in fact, the commission adopted Dr. Klock's opinions, not Dr. Ingberman. How do we know this? Because the commission said she had complex regional pain syndrome. He's the one who had testified she had it. Dr. Ingberman completely denied that. So the commission adopted the finding that she had complex regional pain syndrome, and the commission awarded all of her treatment. The only thing they did was vacate any future treatment based upon this video. That is what the circuit court agreed with me on that the commission was inappropriate to do, and the reason is there's no evidence here, again, that what occurred in this video, that it's less than one hour, would mean that her complex regional pain syndrome resolved. Where is the medical evidence that that means it resolved? There's no evidence here where any medical expert, or anything for that matter, says if you can assist your dominant hand while bowling for less than an hour, your complex regional pain syndrome is over. There's no evidence that her complex regional pain syndrome had resolved. So to suggest that activity for less than an hour would somehow mean she's at MMI and she's done, there's no evidence to support that finding. And the circuit court agreed with me. There's nothing in the record to support that finding, no matter what you find on TTD. Dr. Ingberman doesn't support that finding. She doesn't think she had RSD to begin with. Her opinion has been rejected. So the question becomes medically was it appropriate to vacate this award of future medical based upon a video, when there's really no support in the record that what she was doing with the left hand in that video, which again I encourage you to look at because it is not much, what she was doing in any way suggests that medically this condition no longer exists. And so then I would say there's, a man in the circuit court should be upheld as they agreed with me that it was not appropriate to make that medical determination based upon the video. It wasn't a reasonable inference. There's no support for it. Unless there's any other questions. I can't read your name when you signed in. What is your name? Jennifer Kieswetter. I am on the brief, Your Honor, as well. Kieswetter? Yes. Thank you. Thank you. Court will take the matter under advisement for disposition.